UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LATORA COLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:18-cv-01971-JHE |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION[1]

Plaintiff Latora Cole ("Cole") seeks review, pursuant to 42 U.S.C. §§ 405(g) and 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her application for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI").  (Doc. 1).  Cole timely pursued and exhausted her administrative remedies.  This case is therefore ripe for review under 42 U.S.C. § 405(g). The undersigned has carefully considered the record and, for the reasons stated below, the Commissioner's decision is **REVERSED** and this action **REMANDED**.

### I. Factual and Procedural History

On June 1, 2015, Cole protectively filed applications for a period of disability, DIB, and SSI, alleging disability beginning on January 4, 2014.[2]  (Tr. 117, 217-24).  The Commissioner initially denied Cole's claim on August 4, 2015, (tr. 176-85), and Cole requested a hearing before

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 16).

[2] Cole had previously filed applications for a period of disability, DIB, and SSI, but those claims were denied in a final decision by the Commissioner's on April 16, 2015.  (Tr. 151-173).

an ALJ, (tr. 186-87). After a July 31, 2017 hearing, (tr. 56-83), the ALJ denied Cole's claim on October 3, 2017. (Tr. 38-53). Cole sought review by the Appeals Council, but it denied her request for review on September 26, 2018. (Tr. 1-7). On that date, the ALJ's decision became the final decision of the Commissioner. On November 29, 2018, Cole initiated this action. (Doc. 1).

Cole was thirty-two years old on her alleged onset date and thirty-six on the date the ALJ rendered his decision. (Tr. 38, 217). Cole has past relevant work as an assistant manager in retail, a fast food manager, and a basket assembler. (Tr. 77-79).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no presumption of validity

---

[3] In general, the legal standards applied are the same whether a claimant seeks DIB or Supplemental Security Income ("SSI"). However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1)　whether the claimant is currently employed;
(2)　whether the claimant has a severe impairment;
(3)　whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];
(4)　whether the claimant can perform his or her past work; and
(5)　whether the claimant is capable of performing any work in the national

---

[4] The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

>   economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to the formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job." *Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show such work exists in the national economy in significant numbers. *Id.*

### IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

At Step One, the ALJ found Cole had not engaged in substantial gainful activity since January 4, 2014, the alleged onset date of her disability. (Tr. 44). At Step Two, the ALJ found Cole has the following severe impairments: lumbar degenerative disc disease with radiculopathy; morbid obesity; bursitis of the hips; and hypertension. (Tr. 45). At Step Three, the ALJ found Cole does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 46).

Before proceeding to Step Four, the ALJ determined Cole's residual functioning capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined Cole has the RFC

> To perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes or scaffolds. She can frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. The claimant

4

        can have no exposure to hazardous, moving machinery, no exposure to unprotected heights and occasional exposure to extreme cold and/or excessive vibration (such as experienced when operating construction equipment).

(Tr. 47). At Step Four, the ALJ determined Cole could not perform her past relevant work as an assistant manager and a fast food manager. (Tr. 52). Consequently, he did not proceed to Step Five and instead determined Cole had not been under a disability. (Tr. 53).

## V. Analysis

Although the court may only reverse a finding of the Commissioner if it is not supported by substantial evidence or because improper legal standards were applied, "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). The court, however, "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Cole raises several sub-claims of error under the broad claim that the ALJ failed to take into account the effect of her morbid obesity on her other complaints, instead relying on "unsupported findings." (Doc. 12 at 10-11). Cole's sub-claims are that her morbid obesity is inconsistent with an ability to perform sustained work, (*id.* at 10-14); the ALJ erred in considering how Cole's morbid obesity exacerbates her degenerative disc disease, (*id.* at 14-19); the ALJ erred in claiming Cole's back pain improved with treatment; (*id.* at 19-23); the ALJ erred in giving great weight to the opinion of Dr. Robert Heilpern, a non-examining physician, (*id.* at 23-25); and the ALJ erred in assessing Cole's daily activities, (*id.* at 25-27). Because the undersigned finds remand is necessary based on ALJ's erroneous deference to Dr. Heilpern's opinion—an error which

5

incorporates several of the other errors Cole identifies—Cole's arguments are addressed through that lens.

Dr. Heilpern issued his RFC assessment on August 4, 2015, based on his review of records dating to June 26, 2015. (Tr. 121-35). Relevant to this opinion, one set of records Dr. Heilpern reviewed related to Cole's care at UAB West's Orthopedics Clinic under Dr. Gaylon R. Rogers. (Tr. 126-27, 511-24). Dr. Rogers treated Cole for an "interesting and difficult back problem": a small L5-S1 herniated nucleus pulposus ("HNP") abutting the nerve root, for which lumbar epidurals had provided either no benefit or limited relief lasting less than two weeks. (Tr. 523). In February 2015, Dr. Rogers noted that "[t]he real issue with [Cole] is her severe BMI (52/284/5'2)" and that another treating physician had ruled out surgery. (*Id.*). Nevertheless, Dr. Rogers suspected that surgery would be Cole's "only option," pending the results of a selective nerve root block. (*Id.*). The root block was administered on March 23, 2015, and offered Cole "100% improvement and essentially no pain for the next week or so." (Tr. 524). However, Dr. Rogers noted that the HNP was not responding to "fairly extensive conservative measures" over time, and recommended proceeding with microlumbar discectomy ("MLD") surgery. (*Id.*).

On May 26, 2015, Cole returned to Dr. Rogers for a pre-surgery visit. (Tr. 518-22). Dr. Rogers answered Cole's questions about post-op incapacitation, noting "the fact that it can take 2-3 months to really no hair [sic] during its healing process goes along." (Tr. 518). Cole proceeded with the MLD on June 2, 2015. (Tr. 516). She saw Dr. Rogers for a post-surgery visit on June 12, 2015, reporting leaking sutures and "sharp, shooting pains" down her left leg. (Tr. 516-17). Dr. Rogers reported Cole was "doing well" but had some clear drainage on her bandage, consistent with her morbid obesity. (Tr. 517). Dr. Rogers recommended Cole's dressing be changed and that she return in a week for a follow-up. (*Id.*). At the June 19, 2015 follow-up, Cole reported

decreased pain but continuing drainage.  (Tr. 514).  Dr. Rogers recommended continued conservative treatment and weekly visits to see if the wound healed without reexploration.  (Tr. 515).  Cole returned on June 26, 2015, reporting that the incision had closed with no drainage.  (Tr. 513).  Cole also stated she was still using a walker to get around, although she could manage around the house with a cane.  (*Id.*).

Based on these records, Dr. Heilpern formed the following credibility assessment regarding Cole's subjective reports of limitations relating to her activities of daily living:

> The claimant had recent micro laminectomy and discectomy and foraminotomy on left at L5-S1 as well as extreme obesity with a BMI greater than 50 that can cause pain and functional limitations.  The claimant reports she is unable to perform any ADL's without assistance.  MER does indicate some wound weeping from incision sight [sic] but that the claimant's reported symptoms are inconsistent with her MDI.  She also alleges depression and anxiety however has not sought any treatment, does not take any medications for psychiatric symptoms, and has not had any hospitalizations.  Her statements of these limitations are disproportionate to the severity of the MDIs based on the objective findings and MER in file.  Her other statements are credible and basically reflected in the RFC.  Therefore, the claimant's statements are only partially credible for reasoning above.

(Tr. 129).  Dr. Heilpern offered an RFC with postural limitations identical to those imposed in the ALJ's RFC and exertional limitations consistent with light work, also reflected in the ALJ's RFC.  (Tr. 47, 52, 130).  *See also* 20 C.F.R. § 404.1567(b).

The ALJ placed great weight on Dr. Heilpern's opinion.  (Tr. 52).  He found the opinion to be consistent with the record, specifically pointing to the fact that Cole's "condition improved with treatment."  (*Id.*).  The ALJ also noted that "despite periods of tenderness, the claimant had a full range of motion in the lumbar spine and the hips, full motor strength, no sensory deficits, an intact gait and no weakness."  (*Id.*).  The ALJ found Cole's cardiovascular examinations were normal and unremarkable, despite Cole's complaints of occasional chest palpitations.  (*Id.*).  Finally, the ALJ found Cole could "engage in extensive activities of daily living."  (*Id.*).

As a non-treating physician, Dr. Heilpern's opinion was not entitled to any particular weight. *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011) (citing 20 C.F.R. § 404.1527(c)(3)-(4)).[5] Nor, standing alone, is his RFC dispositive of the issue of Cole's disability. *Johnson v. Barnhart*, 138 F. App'x 266, 271 (11th Cir. 2005) (citing *Sharfaz v. Bowen*, 825 F.2d 278, 279-81 (11th Cir. 1987)). Instead, whatever weight Dr. Heilpern's opinion deserved is based on the evidentiary support and explanations Dr. Heilpern provided as well as the opinion's consistency with the record.[6] (*Id.*).

The first problem with the ALJ's decision to place great weight on Dr. Heilpern's opinion is that Dr. Rogers' treatment notes undermine its foundation. Although Dr. Heilpern indicated that Cole's post-MLD state and obesity might cause pain and functional limitations and imposed some exertional and postural restrictions on that basis, (tr. 129-31), this ignores Dr. Rogers' treatment notes explicitly indicating that Cole's incapacity following the surgery would likely not be known until two to three months later. (Tr. 518). Since the latest evidence Dr. Heilpern considered before rendering his opinion was less than a month after the MLD, he lacked any real evidentiary foundation for his supposition that Cole's symptoms would resolve to the indicated level afterwards. Based on the record evidence, Dr. Heilpern's opinion was conjectural.

This leads into the next problem with Dr. Heilpern's opinion: it was stale. Cole points out that Dr. Heilpern's opinion was undermined by two years of evidence between his assessment and the ALJ's decision, particularly concerning complications from the MLD and Cole's subsequent 20-pound weight gain. (Doc. 12 at 24). In fact, Cole continued treatment for her back and hip

---

[5] Section 404.1527 applies to claims that, like Cole's, were filed prior to March 27, 2017.
[6] The regulations also indicate that specialists are owed more deference in the area of their specialties, § 404.1527(c)(5), but that does not apply to Dr. Heilpern.

8

pain following the MLD. On July 20, 2015, Cole returned to Dr. Rogers complaining of pain at the incision site and sharp pains in her lower back that extended down to her left knee. (Tr. 1292). Dr. Rogers found Cole was "coming along as well as can be expected given her problems with weight." (Tr. 1293). But at Cole's next examination with Dr. Rogers, on September 2, 2015, she complained of increasing pain—seven or eight out of ten—and "horrible" balance. (Tr. 1290). Despite Dr. Rogers' belief that Cole was "earnestly trying to lose weight and improve her situation," he noted her pain had increased since she started being more active. (Tr. 1291). He recommended lumbar epidural blocks and pool exercise. (*Id.*).

On September 30, 2015, Cole reported that the epidural block, which she received on September 18, 2015, helped her nerve pain for only four days, with no lasting benefit; while it had helped her lower extremities, her back pain was worse. (Tr. 1286-87). Cole also indicated that water therapy was "awesome." (*Id.*). A lumbar spine exam revealed that Cole appeared to be neurologically intact, but "sensory motor function is totally unreliable from an examination standpoint." (Tr. 1288). Describing Cole's obesity as a "significant hindrance," Dr. Rogers recommended a repeat epidural block. (Tr. 1287). However, after discussions with the physician who performed Coles' last epidural block, Dr. Rogers decided to do a repeat lumbar MRI instead. (Tr. 1289). On November 2, 2015, Cole returned to Dr. Rogers after the MRI, which showed no recurrent herniation and was "essentially completely normal at all 5 levels." (Tr. 1282). Nevertheless, Cole reported pain and numbness down her left leg. (*Id.*). An examination revealed that Cole walked with a hesitant gait, with lumbar tenderness and range of motion ("ROM") restricted by half in all planes. (Tr. 1284). In the absence of improvement with additional epidural blocks, Celebrex, and water therapy, Dr. Rogers stated he was "at a loss to know what else to offer

[Cole] other than again ernest [sic] reassurances on attempting some weight reduction even to the point of considering lapband surgery or gastric bypass surgery." (Tr. 1285).

At Cole's next visit, on December 7, 2015, she reported constant pain, worsening with weight bearing. (Tr. 1278). Cole stated that she had not been back to water therapy, as she had the flu and her referral expired. (*Id.*). In any event, Cole indicated water therapy did not help her back pain; she felt good when in the water, but worse once she got out. (*Id.*). Cole reported she had "called all hospitals in the area" attempting to access a weight reduction procedure, but she had no success with this and no help from her primary care physician. (*Id.*). Dr. Rogers' examination showed Cole was neurologically intact, but moved with some difficulty getting up and down, showed some tenderness at the waist, and displayed stretch signs with mild hip flexion. (Tr. 1280). Dr. Rogers indicated he did "not know how to help [Cole] access an aggressive approach to the obesity issue," and that there was not much else Dr. Rogers could offer. (Tr. 1281). Cole was directed to follow up as needed. (*Id.*).

Cole did not see Dr. Rogers again until October 25, 2016, when she reported bilateral trochanteric bursitis and gluteal pain following an injection. (Tr. 1274). At that visit, Cole weighed 300 pounds—nearly twenty pounds more than she weighed immediately following the MLD, (tr. 516). (Tr. 1274). Dr. Rogers noted Cole had been using a cane for a year or more due to her hip and back pain. (*Id.*). An examination of Cole's hip showed nothing new or different from the last visit except tenderness over the mid-gluteal area and a point specific manner just posterior to the greater trochanter. (Tr. 1276). Dr. Rogers recommended another injection and moist heat. (Tr. 1277).

Several months later, on January 30, 2017, Cole reported back pain getting worse since November 2016, resulting in three falls and pain bending, sitting, and lying down. (Tr. 1269).

Cole also indicated she had bilateral hip pain.  (*Id.*)  A limited examination showed that while Cole moved in a relatively symmetric manner, she used her cane for balance.  (Tr. 1271).  Dr. Rogers again indicated he appreciated no motor weakness, but did not think a sensory examination was particularly reliable.  (*Id.*).  Cole displayed mild stretch signs on the right with flexion past 60-70 degrees, but negative findings on her left side.  (*Id.*).  Her range of motion was "limited consistent with road [sic] obesity."[7]  (*Id.*).  Dr. Rogers stated he believed Cole's "severe obesity is one of the major precipitating issues with her difficulties" and indicated she should contact her primary care physician for consideration of surgical management.  (Tr. 1273).

Cole's next visit—the last to Dr. Rogers in the record before the date of the ALJ's decision—was on April 7, 2017.  (Tr. 1264).  Cole stated that her "body's falling apart."  (*Id.*). She reported nerve pain in the middle of her lower back, across the top of her hips, down her thighs, and down to her toes, causing her to feel as though she was being "ripped apart" when she sneezes or coughs.  (*Id.*).  Cole also reported incontinence.  (Tr. 1264-65).  Dr. Rogers noted Cole's normal MRI findings in October 2015.  (Tr. 1265).  On examination, Cole moved in a guarded manner, but there was no motor weakness and no reliable sensory examination.  (Tr. 1267).  Dr. Rogers suggested an epidural block might show transient benefits, but also encouraged Cole to deal with her obesity.  (Tr. 1268).  Dr. Robert Lansden administered the epidural block on April 18, 2017, observing a restricted range of movement, diffuse lower lumbar paraspinal guarding, an equivocal right dural tension sign, but no appreciable muscle weakness.  (Tr. 1320).

---

[7] The context of Dr. Rogers' reference to "road obesity" implies it is a transcription error of "morbid obesity."  Even though "road obesity" is not a clinical term, the ALJ's opinion reproduces this error without comment.  (Tr. 49).

While Cole's complaints of pain and limitations postdating her MLD do not definitively establish her disability, they reflect symptoms Dr. Heilpern did not have access to, and therefore did not account for, in formulating his RFC.  Nor did Dr. Heilpern's RFC consider Cole's post-surgery weight gain.  To get around this, the Commissioner argues the ALJ reasonably relied on Dr. Heilpern's opinion because it was supported by the "normal examinations [sic] findings that were consistent with his opinion." (Doc. 13 at 12).  The Commissioner cites multiple portions of the record that allegedly bolster this, (*see* doc. 13 at 7), mirroring the ALJ's own citations, (tr. 50-51).  But the majority of the cited evidence either predates Cole's MLD, (tr. 340, 344, 347, 360-61, 383, 415, 425, 435, 438, 444, 453, 463), or reflects normal musculoskeletal and neurological findings at emergency room visits for acute cardiovascular symptoms, (tr. 536, 540, 545, 550, 554-55, 557 (August 22, 2016 visit for palpitations); 652, 1023 (July 6, 2016 visit for chest pain); 1010-11 (August 30, 2016 cardiac consultation); 1042, 1060 (February 11, 2017 visit for chest pain and palpitations); 1088, 1095, 1110 (November 19, 2016 visit for hypertension); 1201-02, 1213, 1232-37 (June 21, 2016 visit for chest pain and palpitations)).  Regardless of whether pre-surgery evidence might have supported Dr. Heilpern's opinion at the time he gave it, it says nothing about Cole's limitations following the MLD; these do little to buttress the restrictions Dr. Heilpern imposed in his RFC.  And while the emergency room notations are facially consistent with the Commissioner's descriptions, Cole was being treated by Dr. Rogers concurrent to some of those visits.  Dr. Rogers, an orthopedic surgeon specifically investigating orthopedic issues, made findings directly contradictory to some of the emergency room notations.  For example, Cole's January 30, 2017 visit to Dr. Rogers showed a limited range of motion consistent with her morbid obesity, (tr. 1271), while Cole's February 11, 2017 emergency room visit showed full range of motion, (tr. 1042)—despite Cole's identical 303-pound weight at both encounters, (tr. 1269, 1030).

The ALJ chose to rely on the emergency room visit notations, but it is unclear why an emergency room visit for an acute issue unrelated to Cole's orthopedic issues would override concurrent evidence from a treating specialist suggesting the opposite. *See Crow v. Berryhill*, 358 F. Supp. 3d 1289, 1295 (N.D. Ala. 2019) (finding notations that claimant was "fully oriented and in no acute distress" at emergency room visits unrelated to mental health provided little support for ALJ to reject treating psychiatrist's assessment). *Cf. also* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). This cherry-picked evidence does little to show Dr. Heilpern's opinion is consistent with Cole's post-surgery state.

  Even apart from Dr. Heilpern's opinion's lack of evidentiary support and inconsistency with the record as a whole, two of the ALJ's remaining reasons for crediting Dr. Heilpern's opinion also do not pass muster. One of these was the ALJ's conclusion that Cole's condition improved with treatment. (Tr. 52). But while the ALJ pointed to nerve blocks as providing months of relief, his citations to the record are inconsistent with his characterization. Instead, Cole reported relief for "a week or so" from one nerve block prior to her surgery. (Tr. 383, 524). On this *exact* visit, though, Dr. Rogers indicated Cole's HNP was "not responding to fairly extensive conservative measures" and recommended surgery. (Tr. 523-24). This is the opposite of the ALJ's conclusion. Furthermore, the ALJ's citation to treatment notes from Dr. Ryan Almeda on June 29, 2017, (tr. 49), indicates that Cole had "greater than 50% relief for mothnths [sic]" in 2015, but ignores both (1) the subsequent statements in the cited record that while epidurals decreased her pain, it was still "[s]evere, debilitating pain at time [sic]," (tr. 1310), and (2) Cole's treatment history with Dr. Rogers indicating only transient relief from epidurals, (*see, e.g.,* tr. 1268). The ALJ also pointed

to Cole's reported pain relief from water therapy on September 30, 2015, (tr. 49, 1286-87), but fails to account for Cole's subsequent statement on December 7, 2015, that water therapy helped with her pain only when she was in the water, and worsened the pain when she finished, (tr. 1278). The record does not back up the ALJ's claim that Cole's symptoms improved with treatment, and consequently the ALJ had no basis for using that claim to assign great weight to Dr. Heilpern's opinion.

Finally, the ALJ also referred back to several portions in his opinion describing examples of what he characterized as Cole's "extensive activities of daily living." (Tr. 52). The ALJ specifically listed Cole's abilities to "care for her children, count change, shop in stores, read, browse the internet and use a checkbook." (*Id.*). With the exceptions of child care and shopping, none of these are postural or pain-related, so the ALJ could not reasonably have relied upon them as consistent with Dr. Heilpern's opinion as to Cole's physical capabilities. As to child care, Cole points out that the portion of her function report indicating she cares for children also indicates "My kids take care of me more than I do them these days." (Doc. 22) (citing tr. 282). Furthermore, the sole indication in the function report of what Cole personally does to take care of her children was: "Children, I love them!" (Tr. 282). Conversely, Cole stated that her "mother, ex-mother-in law, [her] oldest, [her] son cooks and feeds [her] younger kids what they can't do themselves." (Tr. 282). It is not clear how the ALJ derived from this that Cole's child care activities supported her ability to work. Nor is it apparent why the ALJ considered Cole's ability to shop in stores "once a month" for "maybe an hour or two," including the car ride, (tr. 284), as a factor supporting Dr. Heilpern's RFC. Although an ALJ is entitled to consider a claimant's daily activities at Step Four, *see Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (citing 20 C.F.R. § 404.1520(e)), it follows that those activities must actually support the conclusion he reaches. Here, they do not,

and thus they cannot provide substantial evidence to bolster the ALJ's reliance on Dr. Heilpern's opinion.

Considering that Dr. Heilpern's opinion is the only medical opinion evidence in the record and that the ALJ relied heavily on it to formulate the RFC in this case, it was reversible error for the ALJ to have assigned it great weight. Furthermore, the ALJ applied some of the same erroneous conclusions discussed above to discredit other evidence in the record, including Cole's subjective reports. The appropriate recourse here is to remand this case for the ALJ to reassess the evidence, consistent with this opinion. On remand, the ALJ should consider developing the record further by seeking an updated medical opinion that accounts for Cole's status post-surgery.

## VI. Conclusion

Based on the foregoing, and upon careful consideration of the administrative record and memoranda of the parties, the decision of the Commissioner of Social Security denying Cole's claims for a period of disability, disability insurance benefits, and supplemental security income is **REVERSED AND REMANDED** for reevaluation consistent with this memorandum opinion.

DONE this 29th day of May, 2020.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE